Aaron M. Kaufman (TX Bar No. 24060067)
Ariel J. Snyder (TX Bar No. 24115436)*
*pro hac vice pending
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401
Email: akaufman@dykema.com
Email: asnyder@dykema.com

Danielle N. Rushing (TX Bar No. 24086961)
**DYKEMA GOSSETT PLLC**
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395
Email: drushing@dykema.com

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CASE NO. 20-31318-hdh11 |
| GGI HOLDINGS, LLC, *et al.*, | § § | CHAPTER 11 |
| DEBTORS.[1] | § § § | (Joint Administration Requested) |

## DECLARATION OF ADAM ZEITSIFF
## IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITION AND FIRST DAY RELIEF

| | |
|---|---|
| **THE STATE OF TEXAS** | § § |
| **COUNTY OF DALLAS** | § |

I, Adam Zeitsiff, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information and belief:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GGI Holdings, LLC (1222); Gold's Gym International, Inc. (3614); Gold's Holding Corp. (3610); Gold's Alabama, LLC (0520); Gold's Gym Franchising, LLC (5009); Gold's Gym Licensing, LLC (5013); Gold's Gym Merchandising, LLC (4892); Gold's Gym Rockies, LLC (7129); Gold's Louisiana, LLC (9825); Gold's North Carolina, LLC (3221); Gold's Ohio, LLC (4396); Gold's Oklahoma, LLC (7577); Gold's St. Louis, LLC (4827); Gold's Southeast, LLC (9382); and Gold's Texas Holdings Group, Inc. (8156). The Debtors' mailing address is 4001 Maple Avenue, Suite 200, Dallas, Texas 75219.

1.     My name is Adam Zeitsiff.  I am over the age of eighteen, and am fully competent to make this Declaration.  I have never been convicted of a felony or crime of dishonesty or moral turpitude.

2.     I am the President and Chief Executive Office of GGI Holdings, LLC ("Holdings" or the "Debtors"), the debtors and debtors-in-possession in the above captioned case (the "Cases").  I have held this position for more than one year.  Prior to serving in this role, I served as the Debtors' Chief Information Officer.

3.     As the President and CEO, I am familiar with the Debtors' operations, books and records and business plans.  I have personal knowledge of the facts stated herein, or such facts are based on my review of the Debtors' operations, including the Debtors' books and records, and on the information and interviews conducted by me and my staff and professional advisors with the Debtors' officers, members, and employees.

4.     I submit this Declaration in support of the various motions discussed below (the "First Day Motions") that the Debtors are filing on or shortly after the commencement of the Cases on May 4, 2020 (the "Petition Date").

## I. BACKGROUND

*A.     Debtors' History and Business*

5.     Founded in 1965 by Joe Gold in Venice Beach, California, the Debtors presently boast one of the largest networks of company-owned and franchised fitness centers in the world.  The business began its franchise operations in the early 1980s and has grown into a global icon with nearly 700 locations serving approximately 3 million people across six continents each day.  Today, the Debtors own and operate approximately 95 gyms domestically, and hold franchise agreements for more than 600 gyms domestically and internationally.

6. Before the temporary closures caused by the COVID-19 pandemic, the Debtors employed over 4,600 employees at the corporate offices and company-owned gyms. As of the Petition Date, the Debtors employ approximately 111 active employees, of whom approximately 107 are full-time salaried and hourly employees and approximately 4 are part-time employees, and 4,597 furloughed[2] employees, of whom approximately 1,090 are full-time salaried and hourly employees and approximately 3,507 are part-time employees (collectively, the "Employees").

7. The Debtors' brand awareness is among the highest in the world, even in markets where it has no operations, and it has received recent accolades that include "Highest Customer Satisfaction among Health and Fitness Centers"[3] in 2015 and 2016, and "Best Health, Fitness & Beauty Franchise" by *Global Franchise Magazine* in 2018 and 2019.[4]

8. The Debtors' majority owner – TRT Holdings, Inc. ("TRT Holdings") – acquired the business in 2004. Since that time, the Debtors' management has remained committed to company's ability to strengthen its brand and expand its business domestically and internationally. Part of that business and commitment to brand growth included rollouts of new in-gym concepts such as **GOLD'S** STUDIO® — a unique training community with all-inclusive access to enhanced group fitness programs like **GOLD'S** FIT®, **GOLD'S** BURN™, and **GOLD'S** CYCLE™[5] — and a special focus on the Debtors' company-owned gyms to ensure they embodied the Debtors' full "Gold's Gym Experience."

9. Another important feature for the company and its members was the rollout of the **GOLD'S** AMP™ — a digital personal training app that combines over 50 years of Gold's Gym

---

[2] The Debtors have furloughed employees while the gyms remain closed for the health and safety of employees and gym members, and in compliance with federal, state and local orders and guidelines.
[3] *See* https://www.jdpower.com/business/press-releases/2015-health-and-fitness-center-satisfaction-report; https://www.jdpower.com/business/press-releases/2016-health-and-fitness-center-satisfaction-report (last visited Apr. 10, 2020).
[4] *https://www.globalfranchisemagazine.com/awards/winners/* (last visited Apr. 10, 2020).
[5] *See* https://www.goldsgym.com/golds-studio/.

fitness expertise with a custom music library to bring users the ultimate fitness and workout experience anytime, anywhere, whether in the gym, outdoors or on the road. As the first digital personal training app from a brick and mortar gym, **GOLD'**S AMP™ offers users an opportunity to stay engaged and use the Debtors' resources, even when they do not have a Gold's Gym location nearby (or when the gyms are closed due to a worldwide pandemic).

10. The Debtors offer a number of other fitness programs, including small group training, Corporate Wellness programs, 3D body scanning, personal training, group exercise classes and **GOLD'S** CARE™ –an offering that gives members a deeper understanding of their personal health and helps them overcome certain preventative diseases through a prescribed nutrition, fitness and wellness program.

11. Because the Debtors' brand and logos are among the most iconic and recognized in the world, the Debtors have also invested in e-commerce optimization to maximize the value of its brand licensing revenues.

### B. The Corporate Structure

12. The Debtors are a privately held enterprise. A corporate organizational chart of the debtor affiliates is attached as Exhibit A to this Declaration. At the top of the organizational chart is Debtor GGI Holdings, LLC, limited liability company organized under Delaware law ("GGI Holdings"). Its majority owner is TRT Holdings. GGI Holdings' primary asset is its 100% ownership of GGI International, Inc., a Delaware corporation ("International").[6]

13. International's sole asset is 100% ownership of Gold's Holding Corp., a Delaware corporation ("Holding Corp."). Holding Corp. is the primary operating company for the enterprise.

---

[6] GGI Holdings also holds the equity of an entity called Gold's Walzem, LLC. That entity was formed to serve as the landlord for a location in San Antonio. However, in 2019, Gold's Walzem, LLC transferred its interests in the real property and related lease to a third party and, thus, no longer holds any assets.

As discussed further below and in the Cash Management Motion, most accounts receivable and accounts payable flow through Holding Corp., and all Employees are employed and compensated by Holding Corp.

14. Holding Corp. owns each of the other subsidiaries listed in the organizational chart, directly or indirectly. Below are brief summaries of each:

    (a) Gold's Texas Holdings Group, Inc. – The majority of the Debtors' corporate-owned gyms are located in the state of Texas. As of the Petition Date, Gold's Texas Holdings Group, Inc. was the tenant on approximately 61 leases in cities around Texas. While 11 of those locations were closed before the Petition Date, the Debtors plan to maintain the vast majority of these locations.

    (b) Gold's North Carolina, LLC – The Debtor also maintains approximately 11 gyms in the Carolinas. As of the Petition Date, Gold's North Carolina was the tenant on eight (8) of those leases. Two of those locations were closed before the commencement of these Cases.

    (c) Gold's Southeast, LLC – The remaining three (3) Carolina leases are held in the name of Gold's Southeast, LLC. One of those locations was closed before the commencement of these Cases. Gold's Southeast, LLC previously held leases through its wholly owned subsidiaries (Gold's Southeast II, LLC and Gold's Pleasantburg, LLC), but those subsidiaries no longer hold assets or leasing rights. They are not debtors in these Cases.

    (d) Gold's Oklahoma, LLC – The Debtors maintain eight (8) additional leases in the state of Oklahoma through Gold's Oklahoma, LLC. Before the commencement of these Cases, three of those locations were closed.

    (e) Gold's Alabama, LLC – This entity is the tenant on three (3) gym leases in the state of Alabama. As discussed in the Omnibus Lease Rejection Motion, all three of these gyms have been closed, and the Debtors are seeking to reject all three corresponding leases.

    (f) Gold's Gym Rockies, LLC - This entity is the tenant on three (3) gym leases in the state of Colorado. As discussed in the Omnibus Lease Rejection Motion, all three of these gyms have been closed, and the Debtors are seeking to reject all three corresponding leases.

    (g) Gold's St. Louis, LLC – This entity is the tenant on nine (9) gym leases in the state of Missouri. As discussed in the Omnibus Lease Rejection Motion, all three of these gyms have been closed, and the Debtors are seeking to reject all three corresponding leases.

    (h)    Gold's Louisiana, LLC – While this entity is no longer a tenant for any locations in the state of Louisiana, the entity has subleased a location that it previously operated.

    (i)    Gold's Ohio, LLC – As with Gold's Louisiana, Gold's Ohio is no longer a tenant for any locations in the state of Ohio, but it has subleased two locations that it previously operated.

    (j)    Gold's Gym Franchising, LLC, Gold's Gym Licensing, LLC and Gold's Gym Merchandising, LLC – In addition to operating corporate-owned gyms, the Debtors maintain a wide network of franchisee-owned gyms domestically and internationally. The Debtor also supports its brand through licensing and merchandising arrangements. These entities hold that various contracts and intellectual property rights associated with the Debtors' brand merchandising, licensing and franchising rights.

    (k)    Other Non-Filing Subsidiaries – In addition to the debtor affiliates, Holding Corp. holds the equity of four other entities called GGIGC, LLC; Gold's Gym Alliances, LLC;[7] Gold's Gym Payment Processing, LLC; and ELMT 79, LLC. These entities have not owned assets or operations any time in recent history and, thus, have not sought bankruptcy protection at this time.

## C. Events Leading Up to the Bankruptcy Filing

15. While many factors led to the need for bankruptcy relief, no single factor caused more harm to the Debtors' business than the current COVID-19 pandemic, emergency declarations and corresponding guidelines, shelter-in-place or stay-at-home orders from local, state, federal and, in some cases, international or foreign authorities. In mid-March, in response to the growing COVID-19 pandemic, the Debtors were forced to temporarily close all company-owned gyms, and, on information and belief, all or substantially all of the franchisees around the U.S. followed suit within days or weeks. As of the Petition Date, all company-owned gyms remain closed. As a result, the Debtors have been unable to collect membership dues and have no other revenues being derived from their gym operations. Additionally, because a majority of the Debtors'

---

[7] Gold's Gym Alliances, LLC is actually owned by Gold's Gym Licensing, but has no assets or operations.

franchise locations remain closed during the pandemic, the Debtors are not receiving ordinary franchising fees.

16. In light of the sudden and widespread closures brought on by the pandemic, the Debtors began contacting their landlords in late March and early April to advise that they were unable to make ordinary rental payments in April and to request rent abatements or concessions during the temporary closures. As of the filing, the Debtors have continued discussions with the majority of their landlords and believe they will be able to cure and assume (with modifications) the majority of the leases for their company-owned gyms.

17. Unfortunately, the Debtors anticipated that they would not be able to reach agreements with all of their landlords. As discussed below, before the filing of these Cases, the Debtors determined that approximately 32 of their company-owned gyms could not be renegotiated to a level that would allow the gyms to be maintained to the high "Gold's Gym" standard. For that reason, the Debtors decided to close those gyms and reject those 32 leases as part of this bankruptcy filing.[8] The Debtors have already notified their pre-petition lenders about this decision and believe that it is in the best interest of the bankruptcy estates to abandon any remaining assets in those locations. While most of the equipment in these 32 locations was removed before the commencement of these Cases, it is my belief, that the residual value of any equipment remaining in those locations is of inconsequential value to the estates and should be abandoned in conjunction with the lease rejections.

### D. *Goal of the Bankruptcy Case and Proposed Plan of Reorganization*

18. The goal of the bankruptcy is to ensure the strength and continuity of the Debtors' business so that there is no disruption to members, franchisees or licensees once the Debtors and

---

[8] The Debtors are working with gym operators in the areas to find suitable alternatives for the affected members.

their franchisees are able to reopen their respective gyms around the nation and the world. Before the commencement of these Cases, the Debtors negotiated with TRT Holdings or its affiliate, the majority owner of GGI Holdings, LLC, and its senior secured lenders regarding terms of a consensual plan. While the terms are still being finalized, we expect to file a largely consensual plan within the first week of these Bankruptcy Cases, and that plan will effectuate a sale or similar restructuring transaction to TRT Holdings or its affiliate. The Debtors believe the terms of this transaction will be fair and reasonable given current state of the Debtors' business and the surrounding circumstances, because the consideration will be sufficient to: (i) satisfy obligations to the Debtors' senior secured lenders, (ii) satisfy any post-petition financing obligations incurred during these Bankruptcy Cases, (iii) cure monetary defaults with landlords in gyms that will be maintained, (iv) pay all operating expenses during the course of the Bankruptcy Cases; and (v) establish a settlement fund from general unsecured creditors may receive meaningful distributions on their claims. Once filed, the Debtors will seek approval of the disclosure statement as soon as practicable, preferably in mid-June, with the goal of having the plan confirmed by the end of July so that the business can emerge as the country begins to recover from the COVID-19 pandemic. Meanwhile, during the course of these Bankruptcy Cases, the Debtors intend reopen their locations as soon as state, local and federal authorities will allow, and soon as the Debtors' own reopening safety standards are met, so that the business can reemerge as the world begins to recover from the COVID-19 pandemic.

## II. FIRST DAY MOTIONS

*A.    Complex Case Designation*

19.    The Debtors have also filed a Notice of Designation as a Complex Chapter 11 Bankruptcy Case, which I understand from my counsel is in accordance with the General Orders

of the Court when commencing the contemplated complex cases. I believe this designation is warranted because (a) the total claims asserted against the Debtors exceed the $10 million threshold, (b) there are more than 10 entities involved in this filing, and (c) there are over two hundred (200) creditors and parties in interest in these Cases, including landlords, customers, vendors, franchisors and other interested parties. Based on these factors, I believe the Debtors are entitled to a complex chapter 11 case treatment of these Cases, which will allow the Debtors and their counsel to use a limited service list and set hearings on a more frequent basis. I believe such treatment will help the Debtors complete an effective and efficient restructuring through these Cases without incurring unnecessary administrative costs or prejudicing the interests of creditors or parties-in-interest.

### B.  *Motion to Employ Notice Agent*

20.  Due to the volume of filings anticipated in these Cases and the number of creditors to be noticed with each filing, the Debtors have decided to hire BMC Group, Inc. as claims, noticing, solicitation and administrative agent in these Cases. The Debtors solicited bids from a number of similar vendors and selected BMC after comparing bids and negotiating rates that will be cost-effective and reasonable under the circumstances. Such rates are detailed in the application. This expense has been budgeted for and will reduce the total restructuring costs in these cases.

### C.  *Financing Motion*

21.  Before the commencement of these Cases, the Debtors entered into a Credit Agreement (as amended, modified, restated or supplemented, the "Credit Agreement") with JPMorgan Chase Bank, N.A. ("JPMorgan"), Bank of America, N.A. ("BOA"), and Wells Fargo Bank, N.A. ("Wells" and, collectively with JPMorgan and BOA, the "Prepetition Lenders"). The

Debtors' obligations to the Prepetition Lenders was no less than $51.3 million under the credit revolver and outstanding letters of credit allowed under the Credit Agreement. Such obligations are secured by security interests and liens in substantially all of the Debtors' assets, including, but not limited to, the Debtors' cash, cash equivalents, accounts receivable, deposits, intellectual property, and other assets.

22. In order to operate as a going concern during these bankruptcy Cases, while the gyms remain temporarily closed, the Debtors require approximately $20 million in financing. No third-party lender was willing to provide such financing on favorable terms. Accordingly, the Debtors requested a debtor-in-possession loan from its majority owner TRT Holdings (or, in its capacity as debtor-in-possession financing lender, the "DIP Lender").

23. The Debtors intend to borrow enough funds to operate in the ordinary course of business during these bankruptcy Cases. The Debtors anticipate needing approximately $3.5 million in new financing during the first 14 days of these Cases, $9 million in the first 30 days, and up to $20 million over the course of the 13-week budget period.

24. As detailed in the DIP financing motion, the DIP Credit Agreement will include specific milestones for the conclusion of these Cases, including the filing of a plan by May 15, 2020, approval of a disclosure statement by June 15, 2020, and confirmation of a plan by August 1, 2020. Based on the pre-petition negotiations among the parties, the Debtors fully anticipates to beat these milestones to emerge quickly under a confirmed chapter 11 plan.

D. *Employee Wages and Benefits Motion*

25. In order to minimize the personal hardship that the Employees will suffer and to maintain morale and an essential workforce during this critical time, the Debtors seek authority, in their sole discretion, to pay certain pre-petition claims for certain employee wages and benefits,

that the Debtors have historically provided in the ordinary course of business, and to pay all fees and costs incident to the foregoing, including amounts owed to third-party administrators (collectively, and as more fully described in the motion, the "Employee Wages and Benefits Obligations").

26. It is the Debtors' business judgment that maintenance and payment of Employee Wages and Benefits Obligations is essential to the Debtors' going concern. As noted above, the Debtors employ approximately 111 active Employees, of whom approximately 107 are full-time salaried and hourly Employees and approximately 4 are part-time Employees. Due to the temporary COVID-19 closures, the Debtors furloughed 4,597 Employees, of whom approximately 1,090 were full-time salaried and hourly employees and approximately 3,507 were part-time employees (collectively, the "Employees"). As discussed in the applicable motion, the Debtors have continued to provide benefits for such Employees.

27. The next pay day is May 15, 2020, and that period will include a brief period of time before the Petition Date. On information and belief, the Employees would be entitled to assert priority claims for the Debtors' pre-petition Employee Wages and Benefits Obligations. Also on information and belief, no one employee's claim would exceed that statutory cap under section 507(a)(4)&(5) of the Bankruptcy Code. Any delay in honoring such benefits would present a hardship on the Debtors' Employees that would significantly impair the Debtors' ability to maintain its operations as a going concern. For this reason, it is the Debtors' business judgment that it should honor all pre- and post-petition Employee Wages and Benefits Obligations, in the ordinary course of business.

E. *Tax Payment Motion*

28. In the course of its operations, the Debtors (a) collect sales taxes from their customers and incur taxes, including, but not limited to, use and franchise taxes and other taxes necessary to operate their businesses (collectively, the "Taxes"), and (b) incur fees, assessments and charges (collectively, the "Fees") from various taxing and licensing authorities (collectively, the "Authorities") for licenses, permits and other assessments required to conduct the Debtors' businesses. The Taxes and Fees are paid either monthly, quarterly or annually to the respective Authorities. The Debtors estimate that they owe approximately $750,000 in prepetition Taxes and Fees. The Debtors request authority to remit any Taxes and Fees collected in the ordinary course of its operations to the applicable Authorities.

F. *Customer Programs Motion*

29. Members of Debtors' gyms pay initiation fees and prepay membership fees in advance for a particular term. The Debtors have employed several refund policies for their members (the "Refund Obligations"), including a 30-day money-back guarantee, a merchandise return policy, and a cessation of all membership due collection since the COVID-19 shutdowns. The Debtors intend to maintain and honor these Refund Obligations during the course of the bankruptcy cases.

30. The aggregate sum of the Refund Obligations and other Customer Program claims that are accrued but unpaid as of the Petition Date is impossible to determine at this time. But, the Debtors do not anticipate that there will be many outstanding Refund Obligations or other Customer Programs claims remaining unpaid as of the Petition Date. Because certain of the Customer Programs may give rise to post-petition payment obligations from pre-petition practices, the Debtors are seeking authority to make such payments in the ordinary course of business.

### G. Critical Vendor Motion

31. In the ordinary course of business, the Debtors depend on certain vendors (the "Vendors") for the provision of certain services related to the Debtors' health club facilities and corporate operations.

32. To determine which vendors are most essential to operations, the Debtors thoroughly reviewed of their accounts payable and their list of pre-petition Vendors using the following criteria:

   a. whether the vendor in question is a "sole-source" or "limited source" provider;

   b. the costs and delay associated with identifying and qualifying a replacement;

   c. whether the Debtors receive advantageous pricing or other terms from a Vendor such that replacing the Vendor post-petition would result in significantly higher costs to the Debtors; and

   d. the overall impairment on the Debtors' operations that would result if the particular Critical Vendor ceased or delayed services.

33. Based on the foregoing considerations, the Debtors were able to identify approximately 10 Vendors, whose cessation of services would cripple a large number of the Debtors' locations and, therefore, result in immediate and irreparable harm ("Critical Vendors"). By Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors, in their discretion, to preserve these relationships. The total pre-petition obligations owed to the Critical Vendors is approximately $2.3 million. If approved, the Debtors have budgeted to pay these Critical Vendors in instalments over the course of the 13-week budget period.

### H.     Cash Management Motion

34.    The Debtors request entry of an order authorizing the continued use of Debtors' existing bank accounts, business forms, and cash management system and authorizing the continuation of intercompany transactions amongst the Debtors consistent with historical practice ("Cash Management System").  Debtors' Cash Management System is composed of a total of 37 bank accounts.  Substantially all of the Debtors' funds flow between the Operating Accounts and Deposit Accounts and the rest of the Bank Accounts as funds are needed, and are accounted for by intracompany credits and debits.

1.    The Debtors operate their business and generate most of their revenues through Gold's Holding Corp. (the "Operating Company").  All sources of revenue for all of the Debtors are deposited into the Operating Company's Operating Account.  The Debtors then credit the appropriate affiliate responsible for the revenue and debits the appropriate affiliate when payments need to be made on the affiliates' behalf, such as payroll, rent, or other accounts payable.

2.    The Debtors, through the Operating Company, pay their banks approximately $7,300 per month in the aggregate for various fees.  The Debtors estimate that they owe the banks approximately $7,300 as of the Petition Date. However, the Debtors anticipate the closing of certain Deposit Accounts.  In light of this, the Debtors expect their Bank Fees to decrease to approximately $5,800 per month in the aggregate

35.    The Cash Management System provides significant benefits to the Debtors, including, but not limited to, the ability to (a) trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable; (b) control corporate funds centrally; (c) minimize idle cash; and (d) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance presentment

information. Failure to continue the Cash Management System would disrupt the Debtors' operations and impose a financial burden on the estates, while providing little benefit, if any, to the Debtors' estates and creditors.

36. Continued use of the Cash Management System during these Cases is in the best interest of all of the Debtors, their estates, and their creditors, is it will help avoid administrative inefficiencies and expenses associated with disrupting the system and minimize delays in the payment of post-petition obligations. Thus, the Debtors request this Court's authorization to continue to use their existing Cash Management System (as it may be modified by the Debtors in the ordinary course of business).

## I. *Initial Lease Rejection Motion and Future Assumption and Rejection Protocols*

37. Of the Debtors' total 95 company-owned gyms, the Debtors have decided not to reopen approximately 32 of them. This decision was based on several factors, including the historical performances of the gyms, the terms and duration of the leases, and the saturation of the markets where such gyms reside. For the gyms that the Debtors decided not to reopen, the Debtors took steps before the Petition Date to extract all personal property items, including equipment, inventory and other items. On or before the Petition Date, the Debtors have notified the affected landlords of their decisions to reject the leases and surrender possession immediately.

38. As part of the first-day relief, the Debtors are asking for authority to reject the enumerated leases *nunc pro tunc* to the Petition Date and abandon any personal property remaining in such premises. As part of the property extraction process, the Debtors have determined that any remaining personal property is of inconsequential value and would cost more to remove than the Debtors could recover through third-party sales. As such, the property may be abandoned so that the landlords may exercise any applicable rights and remedies.

### J.  Utility Services Motion

39. In the operation of their facilities, the Debtors incur utility expenses for, among other things, water, sewer service, electricity, natural gas, and telephone service by approximately 100 providers (collectively, the "Utility Providers"). These services are provided in multiple states,[9] by more than 100 utilities and through approximately 440 relationships. Due to the large number of utilities and accounts required for Debtors operations, Ecova, Inc. provides utility management services.

40. Uninterrupted utility services are essential to the Debtors' ongoing business operations and, therefore, to the success of their reorganization. As of the Petition Date, the Debtors were about one month behind with some of their Utility Providers. Under the adequate assurances procedures proposed for the Utility Providers, the Debtors will provide deposits equivalent to one month's usage to assure Utility Providers of the Debtors' continued performance during these Cases. If approved, the Debtors have budgeted approximately $675,000 to supply as adequate assurance deposits with their various Utility Providers. The Debtors seek entry of an order determining that payment of an amount equal to one month's utility costs to each Utility Providers is adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and prohibiting the Utility Providers from altering, refusing or discontinuing services to, or discriminating against, the Debtors.

### K.  Motion to Assume Pre-Petition Member Transfer Agreements

41. In the ordinary course of business, the Debtors maintain contracts with its gym members. The contracts are generally month-to-month or paid-in-full arrangements.[10] As

---

[9] Debtors operate in Alabama, California, Colorado, District of Columbia, Illinois, Louisiana, Maryland, Missouri, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, Washington, Wisconsin, West Virginia and Wyoming.

[10] That is, the Debtors do not generally finance gym membership dues.

discussed above, as part of the Debtors efforts to maintain the business as a going concern through the prolonged COVID-19 closures, the Debtors were forced to make the difficult choice to close approximately 32 gyms, predominantly in St. Louis, Alabama, Colorado, and in Texas. To the extent the Debtors maintain gyms near the closing locations, the Debtors will communicate with members regarding their options to transfer to other company-owned or franchise-owned Gold's Gym locations. For the markets where Gold's Gym and its franchisees will maintain no additional gym operations, the Debtors have engaged the following companies, who have each agreed to assume the Debtors' membership obligations.

| Market | Counterparty |
| --- | --- |
| St. Louis Clubs | Club Fitness Holdings, Inc. |
| Alabama Clubs (Birmingham) | Premier Fitness-MS, LLC |
| Alabama Clubs (Montgomery) | UFI-Montgomery LLC |
| Colorado Clubs | Harman Fitness, LLC |
| Texas Clubs (Desoto) | Excel Fitness Holdings, LLC |

42. Also, as part of this effort, the Debtor have negotiated a transaction with ClubFit to purchase the gym-related assets in the Debtors' Ellisville, Missouri location for a purchase price of $400,000.[11]

43. These agreements will generate future revenues for the company that, in the absence of the agreements, would be lost. If we do not find another gym to take over these member contracts, the Debtors will be unable to fulfill our obligations, and customers will cancel membership or stop paying dues. The agreements were negotiated at arms' length, and we believe the terms are fair and reasonable. It is the Debtors' business judgment that these transactions are in the estates' best interests and are necessary to avoid irreparable harm to the Debtors and their going concern. The longer the Debtors wait to assume these agreements, the less valuable they

---

[11] The Ellisville lease is on the list of leases to be rejected immediately. ClubFit has engaged the landlord at the Ellisville location to negotiate terms of a new lease to mitigate any rejection damages.

will be to prospective counterparties like those listed above. For this reason, we are asking for immediate authority to assume these member transfer agreements and related transactions.

### III. CONCLUSION

44. For the reasons provided above, and after due consideration, it is my business judgment and the business judgment of the Debtor that the First Day Motions and related relief should be granted.

[Remainder of the page left blank; Signature to follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, on this 4th day of May, 2020.

                                                */s/ Adam Zeitsiff*
                                                Adam Zeitsiff